Benjamin F. KENT and Employers Casualty Co., Appellants,

v.

SHELL OIL COMPANY and the Texas Company, Appellees.

No. 18181.

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1961.

Rehearing Denied March 7, 1961.

---

Samuel C. Gainsburgh, Raymond H. Kierr, Leonard B. Levy, New Orleans, La., Dufour, St. Paul, Levy & Marx, New Orleans, La., of counsel, for appellants.

Ernest A. Carrere, Jr., New Orleans, La., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., of counsel, for appellees.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is a variation in a minor key of the recurring theme on the rights of maritime workers or those working, ashore or afloat, around maritime enterprises. At times the problem takes the cast of whether the person injured is a seaman entitling him to sue his employer under the Jones Act or the General Maritime Law for Unseaworthiness rather than recover workmen's compensation under either the State or Federal Acts.[1] In others the question is whether in a claim by an employee against his employer, the recovery is under the State rather than the Federal Compensation Act.[2] In others it is whether a person not employed by a vessel is doing work substantially that generally performed by seamen so as to obtain the protection of seaworthiness traditionally extended to seamen.[3] We deal here with the latter phase. More particularly we are confronted with two subsidiary questions. The first is the sufficiency of the proof of asserted unseaworthiness of the vessel and the equipment supposedly furnished by or adopted by the barge.[4] The second is whether an assumed breach of such warranty extends to injuries sustained on shore by an employee of a third party performing services as an independent contractor for the vessel owner under circumstances in which the Louisiana Compensation Act would insulate such vessel owner from third party liability.

As usual the setting and the immediate facts are deceptively simple. Kent sued the Texas Company and Shell Oil Company. Kent was employed by Newsome Truck Line as a truck driver. As

1. See, e. g., Offshore Co. v. Robison, 5 Cir., 1959, 266 F.2d 769, 1959 A.M.C. 2049; Braniff v. Jackson Ave.-Gretna Ferry, Inc., 5 Cir., 1960, 280 F.2d 523; Thibodeaux v. J. Ray McDermott & Co., Inc., 5 Cir., 1959, 276 F.2d 42; see Baer, At Sea with the United States Supreme Court, 38 N.C.L.Rev. 307, 371–78 (1960).

2. See, e. g., Flowers v. Travelers Insurance Co., 5 Cir., 1958, 258 F.2d 220, 1958 A.M.C. 2420, certiorari denied, 359 U.S. 920, 79 S.Ct. 591, 3 L.Ed.2d 582; Noah v. Liberty Mutual Ins. Co., 5 Cir., 1959, 267 F.2d 218, reversing 265 F.2d 547, 1959 A.M.C. 573; Atlantic & Gulf Stevedores, Inc. v. Donovan, 5 Cir., 1960, 274 F.2d 794, 1960 A.M.C. 1311, modified on rehearing 279 F.2d 75, 1960 A.M.C. 1323; T. Smith & Son, Inc. v. Williams, 5 Cir., 1960, 275 F.2d 397, 1960 A.M.C. 1296; see Baer, supra, note 1 at 341, 351.

3. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, 1954 A.M.C. 1; West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, 1960 A.M.C. 15; United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541, 1959 A.M.C. 588; Roper v. United States, 4 Cir., 1960, 282 F.2d 413, 1960 A.M.C. 1719, certiorari granted 81 S.Ct. 466; see Baer, supra, note 1 at 366.

4. Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, 1954 A.M.C. 860; Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, 1954 A.M.C. 1088.

an independent contractor, Newsome transported oil field pipe for Shell from a storage yard near Harvey to Venus, Louisiana, a service port for nearby oil-fields. Shell generally transported much of the pipe in its own trucks. When Newsome hauled pipe, it was obliged to unload it from the truck onto the ground or occasionally onto a barge.

On this occasion Kent's truck along with two other Newsome trucks and one operated by Shell hauled the four loads of 4″ wrapped pipe. This pipe was for use in the fields between wells and tank batteries. On arrival after dark at the Shell yard, the trucks were sent to the Texas Company landing located in a slip off the Mississippi River where the pipe was to be unloaded onto a barge. The unmanned barge was held in against the bulkhead by a tug. Who owned or operated the tug and barge is not shown by the record. It is undisputed, however, that each was to be used for handling this pipe for Shell. There were no lights, save the headlights of one of the trucks, nor any crane or other lift equipment to transfer the pipe from the bed of the truck trailers onto the barge. As a truck was to be unloaded it would be parked parallel to the bulkhead-wharf. Skids—timbers approximately 3″ x 8″ x 15′ long—were run from the barge to the truck. The bottom end of each rested unsecured on the deck of the barge, the other end on the truck tire.[5] The pipe was stacked on the truckbed in a pyramid shape. Pinch bars were used by the truck drivers, one at each end of the truckload, to start a section of pipe moving. The pipe section would drop or roll onto the two skids and then onto the barge. The men, however, stood clear of the pipe ends.

While Kent's truck was being unloaded in this fashion, the skids at the end of the truck opposite him slipped somewhat out of position, apparently from some movement of the barge. His helper restored it to the prior position. At about the same time the skid at Kent's end slipped similarly. To restore its position, he had to place himself between the wharf edge and the side of the truck. That meant also that he was between the load of pipe and the wharf. While in that position some of the pipe started rolling off the truck. What caused it to do so was not shown. There was, however, absolutely no evidence whatsoever that anything done on the barge or in the handling of the skids caused the pipes to move or roll on Kent. In a physical sense, this was due to the manner in which the pipe was loaded or left on the truckbed, was handled by the helper at the other end, or was not properly secured.

The contention now urged is that the Trial Judge erred in not submitting appropriate instructions and special interrogatories under F.R.Civ.P. 49(a), 28 U.S.C.A., on unseaworthiness. But this was all an afterthought in the very closing minutes of the trial. The pleaded complaint was a simple one by Kent against the Texas Company and Shell. It alleged simple negligence and nothing more.[6] Nowhere in the pleadings, or in the pretrial proceedings or in counsel's opening statement to the jury was unseaworthiness or anything remotely re-

---

5. Kent described it somewhat differently. According to him two long skids ran from the barge; a shorter skid then ran from the truck tire down onto the long skid.

6. The complaint stated: " * * * plaintiff was preparing to unload steel pipe from a truck. Plaintiff was on the ground near the truck. An employee of Shell Oil Company * * * was assisting some other person in removing one of the steel pipes * * * and negligently caused the said pipe to fall upon plaintiff inflicting severe * * * permanent injuries * * *.

" * * * Defendant, Shell Oil Company * * * was further negligent in causing plaintiff's injuries, in that said dispatcher instructed plaintiff to unload the said pipe at a place where there was no light, or entirely inadequate light, and under hazardous conditions."

There is no longer any serious contention that a case was made out against the Texas Company as a gratuitous lender of the wharf.

sembling that concept—so well known to plaintiff's experienced counsel—ever mentioned. Nor was there any evidence on the issue other than the bare description of the layout which we have summarized above. Not until the jury submission was the matter raised. But the refusal to charge on unseaworthiness has now become decisive. For the jury by answer to special interrogatories submitted in connection with general instructions (F.R.Civ.P. 49(b)) held specifically that neither Shell nor Texas Company was negligent; that Kent was 50% contributorily negligent; and that the work of hauling and handling the pipe was a part of the usual trade, business and occupation of Shell.

We think the District Court's action in refusing issues or instructions on seaworthiness was proper in several respects.

Kent was a truck driver. What he was doing was unloading a truck. What he was doing in the unloading of the truck might incidentally have been a part of loading the barge, but the equipment complained of—the timber skids—was as much a part of the equipment of the truck as it was of the barge. He was injured by pipe then on the truck rolling off onto him. Nothing the barge or tug did caused the pipe to roll or move. Indeed, nothing about the skids or the fact that they may have slipped or needed repositioning caused the pipe to roll.

■ It might be argued that he would not have been in that position were it not for the skids being used. But the cause of the injury in no sense could be attributed to the vessel or its appurte-

nances, even if it is assumed that the skids were part of the barge's equipment through judicial adoption, see note 4, supra. This means that the "injuries" were non-maritime in nature. The extension of admiralty jurisdiction statute, 46 U.S.C.A. § 740, does not therefore make a classic non-maritime, land-based injury into something else.[7]

■ That brings into play two principles, one of federal constitutional and statutory recognition of exclusive state power, the other concerning the peculiar manner in which Louisiana—within that power—has fashioned its policy respecting the rights of victims of industrial injuries. As to the first, shore-based injuries sustained by those working even in direct relation to maritime matters without exception have long been recognized by the Supreme Court as a matter for application of state compensation acts.[8] And this was given express congressional recognition in the Longshoremen's & Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, in the exclusion from coverage of those claims validly within state compensation statutes.[9] To be sure this involves that phase of the general problem relating to the rights of an employee vis-a-vis his own employer. But this is the prelude for the second principle—the unique Louisiana policy.

■ Unlike many other compensation acts, the Louisiana statute regulates *more* than the rights as between the injured employee and his employer. Under some circumstances it controls the right of such injured worker against a third party not his employer. LSA–R.S. 23:-

7. As the injuries are wholly non-maritime our problem is in no way complicated by the "maritime-but-local" or the "twilight zone" wrinkles.

8. T. Smith & Son v. Taylor, 1928, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520, 1928 A.M.C. 447; State Industrial Commission of State of New York v. Nordenholt Corp., 1922, 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933; Offshore Co. v. Robi-

son, 5 Cir., 1959, 266 F.2d 769, 1959 A.M.C. 2049; see Baer, supra note 1 at 341.

9. Under § 903(a) recovery may be had under the Act only "if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." 33 U.S.C.A. § 903(a).

1061.[10] And as construed uniformly by the Courts this provides in substance that an employee of an independent contractor injured by the negligence of the third party for whom the independent contractor is performing the service has no right to recover damages if the work being performed was a part of the usual trade, business and occupation of such third party. His sole remedy against either his employer or such third party is under the Louisiana Compensation Act[11] which itself carries the usual exclusive liability provision.[12]

This is a part of the Louisiana Compensation Act and reflects that state's policy in dealing with a situation that elsewhere has been productive of many problems in judicial administration.[13] Although the context is different since there it was a direct suit by the employee against his employer, Swanson v. Marra Bros., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045, 1946 A.M.C. 715, seems to make clear that as to such land-based non-maritime injuries it is left to local law to determine rights, duties and remedies. The Court there said of the Longshoremen's Act, "The Act leaves the injured employees in such cases to pursue the remedies afforded by the *local* law, which this Court has often held permits recovery against the employer for injuries inflicted by *land torts* on his employees who are not members of the crew of a vessel. State Industrial Commission of State of New York v. Nordenholt Corp., 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933, 25 A.L.R. 1013 * * * and T. Smith & Son v. Taylor, 276 U.S. 179, 72 L.Ed. 520, 48 S.Ct. 228, both supra; cf. Minnie v. Port Huron Terminal Co., 295 U.S. 647, 79 L.Ed. 1631, 55 S.Ct. 884. Supra. And it leaves unaffected the rights of members of the crew of a vessel to recover under the Jones Act when injured while pursuing their maritime employment whether on board, * * * or on shore. * * *" 328 U.S. at pages 7, 8, 66 S.Ct. at page 872.[14] (emphasis added.)

10. Louisiana Revised Statutes of 1950, 23:1061:

"Principal contractors; liability

"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation * * * and contracts with any person (in this section referred to as contractor) for the execution by * * * the contractor of * * * any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work * * * any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer * * *."

11. Dodge v. Anderson, 5 Cir., 1958, 255 F.2d 246; Leslie v. Cities Service Refining Corp., 5 Cir., 1958, 252 F.2d 902; Fontenot v. Stanolind Oil & Gas Co., 5 Cir., 1957, 243 F.2d 574; Isthmian S. S. Co. of Delaware v. Olivieri, 5 Cir., 1953, 202 F.2d 492; Gant v. Jackson Brewing Co., La.App., 1959, 112 So.2d 767; Thibodaux v. Sun Oil Company, 1950, 218 La. 453, 49 So.2d 852; Turner v. Oliphant Oil Corp., La.App.1941, 200 So. 513; Seabury v. Arkansas Natural Gas Corp., 1930, 171 La. 199, 130 So. 1.

12. Louisiana Revised Statutes of 1950, 23:1032:

"Exclusiveness of rights and remedies; employer's liability to prosecution under other laws

"The rights and remedies herein granted to an employee or his dependent on account of a personal injury for which he is entitled to compensation under this Chapter shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations.

"Nothing in this Chapter shall affect the liability of the employer to a fine or penalty under any other statute."

13. Gilmore & Black, The Law of Admiralty § 6-55 at 363 (1957).

14. This case dealt with the question expressly reserved in O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 43, 44, 63 S.Ct. 488, 87 L.Ed. 596. Countering the contention which prevailed in O'Donnell that extended the Jones Act to shore-based injuries to real seamen, it was urged that logic would

■ Once this principle of local law is accepted, there is no doubt on this record that the facts compel its exercise. Indeed, the jury verdict was categorical in terms of the Louisiana standard. Shell maintains its own fleet of trucks for just such hauling. It supplements the fleet by use of independent contractors including Newsome. The pipe was for direct use in oilfields belonging to Shell. In every sense of the word, what Newsome was to do for Shell was what Shell customarily did for itself. Under Louisiana law, Shell was not liable to Newsome's employee even for its tortious injuries. See note 11, supra.

Since Louisiana forbids recovery of damages against such a third party, it matters not whether the asserted third party claim rests on negligence of a kind known to the common law or that of a kind known to the civil law [15] or on notions of unseaworthiness indigenous to the general maritime law.

■ This conclusion as to the nature of the occurrence and the cause of Kent's injuries affords an additional basis for affirmance independent of this unique Louisiana insulation from liability. Where the injuries are sustained wholly ashore and are caused by a thing not a part of a vessel or its appurtenances, the failure or deficiency of such facility is not deemed either to constitute unseaworthiness or give rise to any recovery under the doctrine of seaworthiness. Fredericks v. American Export Lines, 2

Cir., 1955, 227 F.2d 450, 454, 1956 A.M.C 57.

■ Finally, there is the ground specifically stated by the District Judge in declining the requested instructions on unseaworthiness—the lack of evidence of unseaworthiness, or unseaworthiness as a cause of injury. Unseaworthiness to be sure sets in train awesome obligations which distinguish it from negligence. Michalic v. Cleveland Tankers, 1960, 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20; Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629, 1957 A.M.C. 1927. But neither under negligence principles nor the unseaworthiness doctrine does mere injury give rise to a claim. There must be evidence that within the classic definition of seaworthiness the gear being used is not reasonably fit for its intended use. The only proof here was the brief description of the skids and this physical arrangement. Demonstrating that the last minute request for jury instruction on unseaworthiness may well have been a prescient afterthought in the face of the discouraging prospect that the evidence adduced would soon lead to the adverse jury verdict shortly returned, Kent did not undertake to offer any testimony as to what prudent vessel owners would have done or furnished or the respects in which the appurtenances were considered deficient. Nor was there any evidence offered that any deficiency, even if assumed, was the cause of the injuries. Nothing about the skids or the reposition-

compel a like extension as to the Imbrovek, Haverty and Uravic longshoremen vicarious "seamen." To this date the Supreme Court has not yet extended the seaworthiness protection to land-based injuries sustained by longshoremen. Sieracki spoke of the "common core of policy" that "for injuries incurred while working *on board* the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner." 328 U.S. at page 99, 66 S. Ct. at page 879. To that was appended footnote 17 reading: "17. In this case we are not concerned with the question whether the same policy extends to in-

juries incurred ashore by a stevedore engaged in the same work, a matter which is relevant however in Swanson v. Marra Bros. * * * [decided this day.] Cf. O'Donnell v. Great Lakes Dredge & Dock Co. * * *." We do not reach this problem specifically and we express no opinion on our ultimate determination whether Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555, certiorari denied 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 is correct. See also Pope & Talbot, Inc. v. Cordray, 9 Cir., 1958, 258 F.2d 214; and Valerio v. American President Lines, D.C.S.D.N.Y.1952, 112 F.Supp. 202.

15. LSA–Civil Code Art. 2315.

ing of them, or the necessity for repositioning caused the pipe to roll. We are not here dealing with contributory negligence either as a bar or in reduction of damages on a comparative basis. We are looking at causation for without unseaworthiness being a cause, there was nothing for jury submission on this score.

On the record thus presented, all of the issues under controlling principles were submitted to the jury under appropriate instructions. The jury resolved the controverted facts. There it ends.

Affirmed.